David N. Mair [DM-8883]
KAISER SAURBORN & MAIR, P.C.
111 Broadway
New York, New York 10006
(212) 338-9100

JUDGE PAULEY

13 CV 0317

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

MENG-LIN LIU,

                              Plaintiff,

      -against-                                          **COMPLAINT**

SIEMENS A.G.,

                              Defendant.

----------------------------------------------------------x

RECEIVED
JAN 15 2013
U.S.D.C. S.D. N.Y.
CASHIERS

        Plaintiff, Meng-Lin Liu, by his attorneys, Kaiser Saurborn & Mair, P.C., as and for his

complaint against the defendant, alleges as follows:

## PARTIES AND VENUE

        1.      Plaintiff, Meng-Lin "Louis" Liu ("Liu"), is a resident of the Republic of China

(Taiwan).

        2.      Defendant, Siemens A.G. ("Siemens" or "Siemens AG"), is a German corporation

headquartered in Munch, Germany.

        3.      Siemens maintains an office at 527 Madison Avenue, New York, New York.

        4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because

the claims asserted herein arise under the Dodd-Frank Wall Street Reform and Consumer

Protection Act, 15 U.S.C. § 78u-6(h)(1)(B).

1

5.      Venue is properly laid in this District pursuant to 28 U.S.C. § 1391 because it is a District in which the defendant resides.

## INTRODUCTION

6.      This is a whistleblower retaliation case brought by Liu against his former employer under the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-6(h)(1)(B)

### A.    Overview

7.      Siemens is a multinational electrical engineering and electronics company that has approximately 370,000 employees globally and operates in 190 countries worldwide.  Its common shares are publicly traded on the German and New York Stock Exchanges.

8.      As described more fully below in paragraphs 23 through 29, in 2008 Siemens AG pleaded guilty to conspiring to commit violations of the U.S. Foreign Corrupt Practices Act ("FCPA") and paid record U.S. and German criminal fines and penalties totaling more than $1.6 billion.  In its U.S. Plea Agreement ("Plea Agreement") Siemens admitted to intentionally failing to implement appropriate anti-corruption internal controls and to knowingly circumventing its existing internal controls.  It also agreed as part of the Plea Agreement to overhaul and substantially improve its compliance organization and controls.

9.      Prior to being recruited by Siemens in early 2008, Liu, worked as a compliance officer at AstraZeneca Pharmaceutical, having previously performed consulting engagements for Deloitte Financial Advisory Service in the fields of compliance and internal controls.

10.     In March 2008, Liu was hired by Siemens' wholly-owned Chinese subsidiary, Siemens China Ltd. ("SLC") as the Group Compliance Officer for the Medical Group.

2

Following a restructuring of that group as Siemens "Healthcare Sector" he became Division
Compliance Officer for Healthcare at SLC.

11.     Siemens' Healthcare Sector business develops, manufactures and markets
diagnostic and therapeutic systems, devices and consumables, as well as information technology
systems for clinical and administrative purposes.  Two of the primary types of diagnostic
systems sold by Siemens are Magnetic Resonance Imaging ("MRI") and Computed Tomography
("CT") scanners.

12.     Shortly after he started at SLC, Liu began encountering and confronting a culture
within Siemens' Chinese healthcare business of evading and circumventing the anti-corruption
due diligence systems and controls required by the FCPA and Siemens' 2008 Plea Agreement.

13.     As set forth in more detail below, Liu consistently objected to and tried to remedy
systemic evasion of Siemens' due diligence systems in circumstances where there were major
"red flags" indicating extremely high risks of corruption.  Ultimately, Liu uncovered
incontrovertible evidence that Siemens was submitting inflated bids for many of the multi-
million-dollar medical diagnostic and scanning equipment sales it made to public hospitals in
China, and then selling the equipment at substantially lower prices to intermediaries designated
by the hospital's procurement officials.  In other words, Liu discovered that Siemens itself was
complicit in a scheme whereby the end-user hospitals paid amounts to third-party intermediaries
that were between 20% and 130% higher than the price Siemens received for the equipment,
which was resold by these intermediaries to the end-user hospital at the original Siemens'
inflated bid price.  This had all of the hallmarks of a classic bribery or "kickback" scheme and
there was no legitimate explanation for the huge price differentials that existed between the

3

prices at which Siemens sold the equipment and the prices paid by the end-user hospitals.

14.     Within a week of presenting this evidence to SLC's CFO for Healthcare, Liu was summarily removed from his position as Compliance Officer, instructed not to report to the office for the remaining four months of his employment contract and given "early notice" that his contract would not be renewed upon its expiration. Four months later his employment was terminated.

**B.      The Evasion of Due Diligence and Corrupt Transactions Uncovered by Liu**

15.     The FCPA violations uncovered and opposed by Liu included Siemens' intentional failure to conduct due diligence on third party intermediaries located in China, Hong Kong and North Korea that were involved with sales of imaging and other diagnostic medical equipment to public hospitals in China and North Korea. The evidence uncovered by Liu demonstrated that senior Siemens AG and SLC compliance officials, in-house attorneys and executives knew and/or had substantial evidence of this intentional evasion of Siemens' due diligence policies put in place to comply with the FCPA and Siemens' undertakings in its 2008 Plea Agreement. The internal control evasions uncovered by Liu involved intentional conduct which had no possible innocent explanation.

16.     The range and depth of =Siemens' violations of the FCPA's and Plea Agreement's anti-corruption internal control and due diligence requirements is demonstrated by three sets of transactions: (a) the sale of imaging equipment by Siemens to a North Korean entity named Rakwon 929, which in turn resold the equipment to the North Korean government-owned Red Cross Hospital; (b) the bidding and sale through two off-shore Hong Kong entities of Siemens' imaging equipment for the Chinese People's Liberation Army's 2010 country-wide

requirements; and (c) Siemens' sale of imaging equipment to public hospitals in China through hospital-designated "Import/Export" company resellers. As discussed in detail below, in each instance Liu notified senior executives and compliance officials about the FCPA and Plea Agreement violations and attempted without success to have Siemens AG and SLC remedy the violations. Ultimately, Siemens retaliated against him by stripping him of his transaction review and approval authority and reassigning these responsibilities to someone else.

17.   As Liu dug deeper into Siemens' direct bid transactions, he uncovered irrefutable evidence that the due diligence evasions were deliberately orchestrated in order to cover up participation by Siemens' healthcare business in a bribe-paying scheme that was remarkably simple in its concept. By prearrangement with corrupt procurement officials, Siemens would bid at intentionally inflated prices in public hospital "tenders" involving the sale of major medical and diagnostic equipment such as MRI and CT scanning equipment. After being awarded the bid by the procurement officials, instead of contracting directly with the public hospital, Siemens would enter into a contract to sell the equipment to an "Import-Export" ("I/E") company designated by the hospital's procurement officials. These transactions are hereafter referred to as "direct bid/indirect sales" transactions.

18.   Liu discovered from Siemens' internal records that in many cases the price at which Siemens sold to the I/E company represented a substantial discount from the successful bid price submitted by Siemens through the public tendering system. Liu ultimately reviewed Siemens' records for all direct bid/indirect sales transactions during a three-month period and compiled a spreadsheet documenting the amount by which the successful bid price had been inflated over the actual sale price at which Siemens contracted with the I/E company to sell the

equipment. This price differential was almost always at least 25%, and frequently amounted to 40% to 70%. In some cases the successful bid price was 100% (or more) greater than the actual sale price.

19.    Liu reasonably believed that two major implications necessarily follow from the evidence he had uncovered. First, because Siemens routinely sold equipment at prices that represented steep discounts from the successful bid price, it was obvious that Siemens was intentionally and knowingly submitting "inflated" bids. Second, the only possible explanation for the substantial reduction in price at which Siemens sold to the hospital-appointed intermediary – and for why the procurement officials at the public hospitals would accept the inflated bid prices in the first place – is that this was being used as a mechanism to pay bribes to these procurement officials. The hospitals entered into two-party contracts with the I/E companies, which in turn entered into their own separate two-party contracts with Siemens. In this way, the hospital procurement officials would cause their public hospital to pay the higher accepted bid price to intermediaries and all documentation in the hospital's records would be consistent with that higher price. However, Siemens actually received a substantially lower purchase price, with the "differential" being used to pay kick-backs to the hospital procurement and other officials involved in the scheme. There simply was and is no other plausible explanation for price reductions of the magnitude documented by Liu.

20.    Siemens has at various times attempted to explain these post-tender price reductions as being related to (a) import duty and VAT taxes that Siemens was allegedly obligated to pay on the transactions; and/or (b) changes in scope of the equipment or services being supplied after Siemens' bid was accepted. These explanations are transparently false.

6

21.     First, under Chinese law, import duties or VAT taxes could not have amounted to more than 17-22% of the "net" contract price and therefore could not account for the far higher price reductions on most of the transactions documented by Liu.  Second, Liu reviewed Siemens' bid documents and sales contracts in all of these transactions and verified that the scope of equipment and services specified in each was the same.  Moreover, the I/E companies selected by the hospital procurement officials did not perform any of the installation or after-sales services for the equipment, nor were they qualified to do so.  Rather, when required by the scope of the bid, Siemens (or subcontractors hired by Siemens) provided these services and they therefore cannot provide an explanation for Siemens giving the I/E companies a discount from the accepted bid price..

22.     Perhaps most telling, however, was the fate that immediately befell Liu after he compiled a detailed spreadsheet showing the magnitude of Siemens' inflated bids and presented the spreadsheet to SLC's CFO for Healthcare.  He was removed from his position and placed on a leave of absence within a week and was terminated three months later as soon as his contract ended.

### FACTS GIVING RISE TO THE CAUSES OF ACTION

**A.   Siemens' 2008 Guilty Plea for Widespread Violations of the FCPA and its Payment of the Largest Fines in History for Such Violations**

23.     On December 15, 2008, the U.S. Department of Justice ("DOJ") announced that Siemens AG agreed to plead guilty to conspiring to commit violations of the FCPA.  The criminal fines imposed, totaling more than $450 million, are the largest in the history of the FCPA, and were supplemented by more than $350 million in ill gotten profits that Siemens agreed to disgorge as part of a settlement in a parallel SEC suit.  On the same day, the company

announced that it had entered into a second settlement with the German authorities, agreeing to pay penalties of 395 million Euros in addition to 201 million Euros in penalties that it paid in an earlier settlement. German and U.S. criminal fines and penalties totaled more than $1.6 billion.

24.     For the first time, the DOJ charged a company with a criminal violation of the FCPA's internal controls provision. This criminal charge was based on Siemens' failure to implement an effective FCPA compliance program. In pleading guilty, Siemens AG admitted that it lacked sufficient anticorruption compliance controls and that its senior management failed to take action once it was aware of significant control weaknesses. Siemens admitted to intentionally failing to implement appropriate internal controls and knowingly circumventing its existing internal controls.

25.     According to the criminal information filed by the DOJ, many compliance failures at Siemens stemmed from its use of sham consultants as channels for payments to government officials. Siemens retained these consultants and other intermediaries without conducting adequate due diligence or providing proper oversight. Over many years, Siemens ignored reports of questionable or improper business practices identified to Siemens senior managers, including not having a legitimate business purpose for using intermediaries. Siemens intentionally failed to undertake rigorous investigation despite its awareness of such significant compliance failures.

26.     In addition to failing to maintain an adequate system of anticorruption compliance controls, the DOJ's criminal information also charged that Siemens AG systematically falsified its corporate books and records to conceal corrupt payments its employees were making on the company's behalf.

8

27.     In a separate action, the SEC complaint alleged that Siemens made nearly 4,300 separate corrupt payments totaling approximately $1.4 billion in order to obtain or retain business around the world, including China.  Siemens concealed the true nature of these payments to obscure the actual purpose and ultimate recipients.  The SEC complaint further alleged that Siemens' leadership failed to respond to a series of "red flags" that indicated the widespread nature of bribery at the company, including reports from internal compliance attorneys as well as external auditors.

28.     According to the SEC complaint, Siemens paid approximately $14.4 million in bribes to intermediaries in connection with $295 million in sales of medical equipment to five Chinese-owned hospitals.  The former controller of Siemens oversaw the business relationship between Siemens and the affiliate of the Hong-Kong-based intermediary that it used to pay these bribes.

29.     As part of its U.S. Plea Agreement and SEC settlement, Siemens agreed to overhaul and substantially improve its compliance organization and controls.  According to the DOJ's Sentencing Memorandum filed on December 12, 2008, Siemens added large numbers of employees and resources to its compliance office and improved anti-corruption policies, procedures, and controls. Siemens also agreed to tighten its oversight of third parties, a key step given their use by Siemens in making many of the corrupt payments.   The DOJ cites further "exceptional" remediation efforts undertaken by Siemens, including implementation of sophisticated web-based tools for third-party due diligence and a confidential channel for employees to report irregular business practices.  Finally, Siemens agreed to accept a third-party independent compliance monitor to evaluate and report to the Department of Justice on the

company's ongoing compliance with the FCPA.

**B.     Siemens' Legal Obligation to Implement and Enforce Due Diligence Procedures**

30.     Pursuant to the Securities Exchange Act of 1934, as amended by the FCPA, all U.S.-publicly traded companies, including Siemens, are legally obligated to implement internal controls reasonably designed to prevent and detect FCPA anti-bribery violations, including conducting due diligence prior to entering into business relationships with third parties in order to reduce the risk of corrupt payments by those third parties.

31.     These laws also require such companies to take steps to address "red flags" raised during the due diligence process or while negotiating business relationships with third parties. Such "red flags" include the history and risk of corruption in the relevant foreign country, unusual payment patterns or financial arrangements and unusually high commissions or compensation arrangements.

32.     Siemens additionally undertook legal obligations as part of its U.S Plea Agreement in December 2008 to implement  internal control systems which included appropriate due diligence relating to its business partners.  Specifically, the Plea Agreement provides, in relevant part:

> [Siemens] represents and agrees, as a condition of the plea agreement, that its internal controls and compliance code will include ...(8) Appropriate due diligence requirements pertaining to the retention and oversight of agents and business partners.

A copy of the Plea Agreement is annexed hereto as Exhibit 1.

**C.     Siemens' Transaction Approval and Business Partner Due Diligence Systems**

33.     On paper, Siemens paid lip service to its legal obligation to implement appropriate due diligence with respect to its business partners and business transactions.

Siemens' internal procedures require that, before it enters into business transactions or makes payments to certain categories of business partners, the compliance risk for such partner must be categorized and due diligence performed and reviewed by management and compliance personnel.

34.     The categories of business partners to which these due diligence requirements expressly apply under Siemens' internal policies include, *inter alia*, all third parties that contract with Siemens to purchase its products or services, sell those products or services to third parties and meet any one or more of the following criteria (hereafter "High Risk Business Partners"):

      (a)     The contract with the business partner is concluded for a particular project and/or customer and the Siemens business unit knows the identity of the customer; or

      (b)     The business partner receives a discount for a specific project and/or customer and the Siemens business unit knows the identity of the customer; or

      (c)     The business partner is stipulated to Siemens by a third party (such as the customer).

35.     Pursuant to Siemens' internal policies, due diligence must be conducted for all High Risk Business Partners using the Siemens' Business Partner Compliance Tool ("BPC Tool"). Based upon required inputs for each business partner, this computerized tool determines the risk level and, consequently, the level of due diligence and the level of approval required, for the business partner.

36.     In addition to performing due diligence on specific High Risk Business Partners, Siemens has a separate mandatory internal approval process for approval of each Siemens customer project valued at more than 100,000 Euros. This process, called the "Limits of Authority" ("LoA") process, gives certain levels of Siemens' management and compliance

officials the sole authority to approve the submission of bids and contracts for such projects. The LoA process's stated purpose is to ensure the requisite quality and level of decision regarding whether and how Siemens will bid on a project, to incorporate ethical and legal criteria into this decision-making process and to ensure conformity with all internal control guidelines and legal requirements designed to prevent corruption.

37.     In furtherance of its stated goal of preventing corruption, the LoA process determines when proposed transactions and bids have sufficient red flags to require a mandatory Anti-Corruption Risk Assessment ("Anti-Corruption Risk Assessment"). Pursuant to Siemens' internal policies, such an assessment is required prior to entering into a contract where any one or more of the following criteria are met: (a) the Project category is designated as either "A" or" B" under Siemens' internal classification system (these are the two highest categories based on the project value and complexity); (b) a High Risk Business Partner is involved in the project; or (c) the country in which the customer is located or the project is executed is a "high-risk country" and is a different country from the country in which the contracting Siemens business unit is located.

**D.    Siemens' Intentional Evasion of Due Diligence Requirements in the North Korean Transaction and Liu's Opposition to Such Evasion**

38.     In the fall of 2009 Liu uncovered and objected to Siemens' manipulation and evasion of its mandatory due diligence and anti-corruption procedures in a transaction involving the sale of three high-end medical diagnostic machines to a North Korean hospital.

39.     In July 2009, Siemens was approached by Rakwon 929 Import Corporation ("Rakwon 929"), a North Korean entity acting as the intermediary in the transaction. The end-purchaser was disclosed to Siemens as being the Red Cross Hospital in North Korea. The

proposed transaction involved the sale of three Siemens SOMATOM Emotion 16-slice CT Scanning systems.

40.     The Rakwon transaction met at least three of the LoA system's criteria for triggering a mandatory Anti-Corruption Risk Assessment, which is mandatory when any one of these criterion is met.

41.     The first independent mandatory Anti-Corruption Risk Assessment trigger was that Rakwon fell squarely within the definition of a High Risk Business Partner for which due diligence must be conducted in accordance with the Business Partner Compliance Due Diligence System.  Specifically, Rakwon 929 was purchasing specific products and services from Siemens and reselling them to an end-user third-party hospital whose identity was known to Siemens' business unit.

42.     The second independent mandatory Anti-Corruption Risk Assessment trigger was that the transaction involved the sale from Siemens' Chinese business unit to a customer located in a different country that was a high-risk country.[1]  Indeed, North Korea has long been known as one of the most corrupt countries in the world, with its entire economy controlled by its government.

43.     The third independent mandatory Anti-Corruption Risk Assessment trigger was that Rakwon 929 was designated as an intermediary by the end-user customer rather than Siemens.

44.     Accordingly, Siemens' LoA process required that a mandatory Anti-Corruption

_____

[1] North Korea has been assigned a Corruption Perception Index ("CPI") rating of 1 by Transparency International, indicating one of the highest risks of corruption on that organization's scale of 0-10.

13

Risk Assessment be performed before the transaction itself could be internally approved.

45.     Angela Wuerfel, the senior employee in Siemens' healthcare business group with responsibility for the transaction, warned Stephan Mueller, SLC's CFO for Healthcare, in an email dated July 20, 2009 that the transaction required anti-corruption and due diligence reviews before it could proceed.  Wuerfel also told Mueller  that it would require an export license.

46.     However, Siemens' healthcare business employees, together with Stefan Hoffmann-Kuhnt, its Regional Compliance Officer for China and Liu's direct manager at that time, obtained approval for the transaction without ever complying with the mandatory anti-corruption and due diligence reviews.

47.     On or about September 28, 2009, Siemens entered into the contract for the sale of three SOMATOM Emotion 16 CT Scanners for a price of 1,056,000 Euros.  The contract was structured as a two-party contract between Rakwon 929 and Siemens' subsidiary, Siemens Shanghai Medical Equipment Ltd.  ("SSME")

48.     Siemens was not a party to the ultimate sale between Rakwon 929 and the Red Cross Hospital and the terms of that sale were apparently not disclosed to Siemens.

49.     Although the Rakwon transaction was handled through SSME, a subsidiary of Siemens in China within Liu's compliance authority, Liu's manager Hoffman-Kuhnt, handled the LoA process for the transaction himself without involving Liu.  However, as a result of Liu's involvement in the due diligence performed on an entity that was purportedly being used as a Siemens sub-contractor for after-sales warranty service on the North Korean transaction, Liu learned in late October that no Anti-Corruption Risk Assessment had been performed with respect to the Rakwon transaction.  Liu also realized that this could only have been accomplished

if Hoffmann-Kuhnt and the business unit had deliberately failed to designate Rakwon as a "Business Partner" and thereby manipulated the LoA system into permitting the transaction to be approved without an Anti-Corruption Risk Assessment.

50.     Liu therefore sent an email dated October 29, 2009, to SLC's CFO for Healthcare, its LoA Officer, and Bernard Ohnesorge, SLC's CEO for Healthcare, objecting to the evasion of the due diligence required for this transaction.  In that email he stated:

> [A]s healthcare compliance officer, I have to issue this letter for evidence purposes.  I, based on the information available, did not concur that the compliance risk for this project was properly addressed [because] no AC risk assessment was approved nor acknowledged for SLC Healthcare Compliance.  It is strongly suggested that [the] necessary steps should be taken to comply with the LOA process.

A copy of Liu's email is annexed hereto as Exhibit 2.

51.     Several hours after sending his October 29, 2009 email, Liu received a call from Ohnesorge, the business leader for the entire Healthcare Sector in China, who asserted that the LoA process had been followed and that no Anti-Corruption Risk Assessment had been required. When Liu challenged this assertion, Ohnesorge instructed Liu not to raise any further concerns about the matter.

52.     Liu remained very concerned about the compliance violations in the Rakwon transaction and therefore sent a question regarding the North Korea project to Siemens' "Ask us Hotline," a web-based tool for Siemens employees and compliance officers to ask compliance related questions.  The hotline had been established as part of the comprehensive internal compliance system implemented by Siemens to fulfill its obligations under the FCPA and the 2008 Plea Agreement.

15

53.     Liu received a call back immediately from one of the Hotline Question Managers and explained his concerns, making it clear that Hoffmann-Kuhnt was directly involved in approving this project.  The Hotline Manager told him he would receive a follow-up call from the "appropriate" compliance officer.

54.     To Liu's astonishment, the following week he received the follow-up call from the very person who was the subject of his complaints, Hoffman-Kuhnt himself.  Hoffman-Kuhnt did not deny to Liu that the Anti-Corruption Risk Assessment should have been performed and was unable to provide an explanation as to why it was not.  Hoffman-Kuhnt also promised to provide the export control clearance for the transaction although he never did.

55.     The following month Ohnesorge and Hoffmann-Kuhnt retaliated against Liu for ignoring their instructions to drop his objections to the failure to perform the mandatory Anti-Corruption Risk Assessment for the Rakwon transaction.  Specifically, on December 17, 2009, Hoffman-Kuhnt met with Liu and made unfounded criticisms of his performance.  They also asked him to agree to a baseless performance improvement plan which Liu declined to do.

56.     Hoffmann-Kuhnt was subsequently promoted to the position of Siemens' Global Corporate Compliance Officer and moved back to Germany in early 2010.

57.     In a May 10, 2010 email to SLC's Regional Compliance Officer and Siemens' Healthcare Sector General Counsel based in Munich, in which he complained about Siemens' widespread due diligence failures and the retaliation to which he was being subjected in response to his complaints, Liu repeated his concerns regarding the Rakwon 929 transaction.  In that email, Liu again reiterated his  concerns with the North Korea transaction:

> In Oct 2009, in name of Siemens Shanghai Medical Equipment Co
> (SSME), Siemens sold healthcare equipment to North Korea. The

> transaction involved almost every compliance risk factors of compliance control, i.e. High risk country, Governmental involvement, Off-shored bank payment, Export control and so on. However, the LoA process [was] still [bypassed] without compliance review....

A copy of this email is annexed hereto as Exhibit 3.

**E.   Siemens' Intentional Evasion of Due Diligence Requirements in Connection with Import/Export Companies Selected by Chinese Public Hospitals and Liu's Opposition to Such Evasion**

58.     Starting in late 2008, shortly after he arrived at the Company, Liu interviewed numerous sales and other Siemens managers responsible for imaging equipment sales in China in order to confirm the Company's compliance with the Plea Agreement and to understand the nature of Siemens' past FCPA violations.  As a result of these discussions, Liu discovered that I/E companies, who were appointed by public hospitals to act as the sole counter-parties in Siemens' sales contracts, were not being subjected to pre-contract due diligence in the Business Partner Compliance Tool and were not being subjected to the Anti-Corruption Risk Assessment required by Siemens' LoA process.

59.     In an email dated December 17, 2009, from Bernard Ohnesorge, SLC's CEO for Healthcare, to Liu, SLC's CFO for Healthcare, Stephan Mueller and SLC's Regional Compliance Officer, Hoffman-Kuhnt, Ohnesorge reiterated instructions he had earlier issued that the I/E companies who acted as resellers of Siemens' medical equipment were to be exempted from the BPC Tool due diligence process.  A copy of Ohnesorge's email is annexed hereto as Exhibit 4.

60.     In other words, the CEO of Siemens' Chinese healthcare unit expressly mandated to the unit's CFO and Chief Compliance Officer that I/E companies be exempted from the

Siemens' mandatory business partner due diligence requirements. This also necessarily exempted these I/E companies' contracts from Siemens' mandatory Anti-Corruption Risk Assessment required for all High Risk Business Partners.

61.     Liu believed that Siemens' failure to perform due diligence and Anti-Corruption Risk Assessments with respect to I/E companies constituted a violation of its due diligence obligations under the FCPA and was a violation of its Plea Agreement.

62.     In December 2009 Liu was interviewed by a Special Review Team that was tasked pursuant to a recommendation by the DOJ-appointed Monitor with conducting a review of the Business Partner Compliance Tool's operation and effectiveness in preventing corruption in China. In that interview Liu expressed his concerns regarding the exclusion of I/E companies from the due diligence and anti-corruption processes. The Special Review Team agreed with Mr. Liu that I/E firms required pre-transaction diligence.

63.     The Review Team completed its review and issued a report ("Review Team Report ") dated January 29, 2010. A copy of the Review Team Report is annexed hereto as Exhibit 5.

64.     The Review Team Report found that:

> SLC [Regional Compliance Officer] in coordination with [Headquarters Healthcare Sector Compliance Officer] decided to exclude I/E-companies related to sales and tendering business from the [BPC Tool due diligence] approval. Because of recent compliance concerns by the [Division Compliance Officer] for "classic" Healthcare China [i.e. Liu], this decision is currently in review within SLC management and compliance office.

(Exhibit 5, Page 14)

65.     The Review Team Report warned that bidding and/or selling through I/E Agents

raised two major red flags. The first major red flag was that "in most cases customers choose their 'partner of trust' and stipulate them to the respective Siemens unit." *Id.*

66.     The second major red flag identified by the Review Team Report was that "[[t]he I/E-companies used by bigger hospitals are the former purchasing departments of these hospitals and were...outsourced." *Id.*

67.     The Review Team Report expressly concluded that Siemens' internal due diligence policies required that I/E companies that were stipulated to Siemens by the end-user public hospitals be reviewed in Siemens' BPC Tool. *Id.*

68.     However, instead of issuing a recommendation that such I/E companies henceforth be subject to the due diligence required by Siemens' internal policies, the Review Team Report instead deliberately avoided making such a recommendation and deferred the decision to the same Siemens' officials who were responsible for improperly evading due diligence procedures for I/E companies in the first place.

69.     Specifically, the Review Team Report recommended that: "A decision regarding the relevance of I/E companies to the BP process has to be made together with the responsible Sector Compliance Office."

70.     In sum, the Special Review Team (1) expressly found that Siemens' mandatory due diligence processes were not being followed; (2) expressly identified major red flags which heightened the need for due diligence and anti-corruption procedures to be followed; but (3) ignored both of its own findings and instead allowed the compliance executives to continue violating these mandatory procedures if they chose to do so.

71.     As set forth in more detail below, five months later, on June 30, 2010, the Sector

19

Compliance Office issued a memorandum declaring that in almost all cases the business unit could continue to exclude I/E companies designated by hospital procurement officials post-bidding from any due diligence or anti-corruption review.

72.     Nothing better serves to highlight the deliberate and willful decisions that were made by the highest levels of Siemens' legal and compliance executives to ignore the anti-corruption and due diligence procedures it was legally obligated to follow and to deliberately turn a blind eye to transactions that had an extremely high risk of corruption.

73.     As Liu continued investigating the use of I/E companies in SLC's public hospital sales, he began uncovering evidence that there were often substantial price differentials between the price contained in Siemens' successful direct bids to the public hospitals and the lower price at which Siemens subsequently sold the equipment to the I/E company designated as the hospital's intermediary.

74.     In April 2010, Liu prepared a power point presentation in an attempt to pressure his superiors to follow Siemens' internal mandatory compliance procedures by including I/E companies in the mandatory due diligence review as High Risk Business Partners.  Liu made it clear that "the exclusion of all I/E companies from BPT [the Business Partner Compliance Tool] cause[s] [a] loophole [in Siemens'] compliance control[s]."  He therefore argued in his presentation that, based on Siemens' mandatory policies:

> Due to [the] specific healthcare china business nature, I/E
> Companies in China [are] not only [import] clearance agents, in
> healthcare business, they [are] also involve[d] in [the] sale and
> tender business.  Due to this high risk business practice it is
> essential to define such I/E companies as business partner[s] [in
> situations where they] additionally fulfill the following criteria:
>
>      - Price deviation [exists] between [price contained

20

in] sales contract signed with Siemens and contract
signed with end-user

- I/E companies [are] stipulated by end-user
(Hospitals)

A copy of the power point presentation is annexed hereto as Exhibit 6.

75.     Liu therefore expressly made SLC's management and Siemens' senior
compliance officers aware in his power point presentation in April 2010 of the price deviations
that existed between the sales contract that the I/E companies signed with Siemens and the
contracts signed by the end-user public hospitals that had awarded Siemens' successful direct
bid.

76.     Two months later, on June 30, 2010, Siemens' global Healthcare Sector
Compliance Officer, Thomas Hauser, based in Germany, and Ms. Zhao Ai Li, who had taken
over from Mr. Hofmann-Kuhnt as Regional Compliance Officer for China, issued a
memorandum entitled "Memorandum on Handling of Import and Export Agents in SLC
Healthcare Commission Business" ("June 30 Memorandum").  The June 30 Memorandum
purported to be issued pursuant to the recommendation of the Special Review Team Report that
a decision on whether or not to require due diligence on I/E companies should be made by the
Sector compliance office.  Once again, however, Hauser and Zhao exempted I/E companies from
any due diligence in virtually all Siemens direct bid tender business in China in blatant violation
of Siemens' internal policies and procedures.  A copy of the June 30 Memorandum is annexed
hereto as Exhibit 7.

77.     Notably, the June 30 Memorandum expressly acknowledged a concern that I/E
companies were being used for corrupt purposes in the Siemens transactions:

21

> There could be legitimate reasons for involving an I/E, e.g. the
> end-customer does not have the import and export license; or the
> end-customer does not have the capability to handle import and
> export etc. ***However, we cannot exclude the possibility that I/E
> and the end-customer abuse the structure and make other
> dealings under the table.***

(Exhibit 7, footnote 2) (emphasis added)

78.     However, after acknowledging this major red flag, the June 30 Memorandum
proceeded to entirely ignore it, together with the express finding of the Review Team Report that
Siemens' internal due diligence policies required that I/E companies that were stipulated to
Siemens by its customers be reviewed in Siemens' BPC Tool.  Instead, the June 30
Memorandum mandated that almost all I/E company resale transactions in China should be
exempted from Siemens' mandatory due diligence and anti-corruption procedures.

79.     Moreover, the authors of the June 30 Memorandum entirely ignored the most
significant red flag of all, namely that major price deviations existed between Siemens'
successful bid price and its sale price to the third-party intermediary I/E companies.

80.     Hence, the June 30 Memorandum constituted yet another example of the highest
levels of compliance executives at Siemens deliberately turning a blind eye to overtly corrupt
practices in sales to Chinese public hospitals and intentionally evading the due diligence system
established to comply with the requirements of the FCPA and Plea Agreement.

### F.   Liu Offers a Transparent Solution to Remove Corruption Risk from Selling Through I/E Companies

81.     Based on the evidence he uncovered, Liu reasonably believed that there was no
legitimate business reason for Siemens to sell its equipment to the I/E companies for
substantially less than Siemens' successful bid price that had been accepted by the hospital.  He

believed that the only plausible explanation was that, the hospital paid the I/E companies and/or other intermediaries the far higher Siemens' direct bid price and that the substantial differential between this and the price received by Siemens was siphoned off to pay bribes to corrupt officials. It simply defied any legitimate business explanation that Siemens would not contract with the end-user itself and capture the often significantly higher price it bid to the hospital. His concern was heightened because the I/E companies were almost always selected by the hospital's procurement officials and not by Siemens itself.

82.     Liu realized that the extremely high corruption risk posed by these price deviations could be eliminated if Siemens entered into a single tripartite contract with the end-user hospital and the I/E company, whereby all three parties signed a single contract and agreed to the same terms and conditions, including a single buy/sell price. This would allow for transfer of title to the I/E company so it could provide legitimate customs clearance and importation services-- assuming that taking title to the equipment was indeed legally required. However, the corruption risk would be vastly reduced because any price deviation would be transparent to both Siemens and the hospital and would have to be commensurate with the services provided by the I/E company. The tripartite contract could also provide for the I/E company to receive a legitimate customs clearing fee of approximately two percent of the transaction amount.

83.     In April of 2010, after obtaining proof of these substantial price deviations, Liu tried to implement the tripartite contract structure in order to ensure that the I/E companies designated by the hospitals would not be used for corrupt purposes.

84.     On April 29, 2010, Liu circulated an email requiring that, with effect from May 5, 2010, SLC's Healthcare sector must enter into tripartite sales contracts between Siemens, the

23

end-user hospital (actual buyer) and the I/E company (nominal buyer).  Liu attached to his email

a copy of a tripartite contract that had been prepared by Siemens' legal department.  A copy of

Liu's email is annexed hereto as Exhibit 8.

85.     In his April 29 email, which he copied to Ohnesorge, Liu explained that:

> The deviation of price and /or obligation between [the]
> [Siemens]/IE contract and [the] I/E hospital contract is not
> acceptable, [either] from [a] legal [or a] compliance perspective.  It
> is our commitment and duty to commence business through [a]
> legitimate and transparent approach.  [The] Compliance officer, as
> stipulated in ethic[s] rules, is under [a] fiduciary duty to raise the
> red flag if the misconduct is knowingly proceed[ing].

86.     Later that evening Ohnesorge replied to Liu's email and countermanded Liu's

direction that the tripartite contract be used.  Ohnesorge claimed that Siemens AG would have to

issue "a binding guideline" authorizing the tripartite contract before it could be used for China's

healthcare business and reprimanded Liu for issuing his tripartite contract directive.  A copy of

Ohnesorge's email is annexed hereto as Exhibit 8.

87.     After the stand that Liu took on the use of I/E companies, Zhao Ai Li, Siemens'

Regional Compliance Officer for China and Liu's direct manager, began placing increasing

pressure on him to leave Siemens.  She repeatedly told him that if he was not happy at Siemens

he should look for another job and issued a thinly-veiled threat by asking him: "Do you really

think your career at Siemens is going to be successful?"

88.     Zhao and Ohnesorge also retaliated against Liu by preventing him from attending

Siemens' internal global healthcare compliance conference in Germany in early May 2010.  Liu

had been invited to attend the conference by Ritva Sotamaa, General Counsel of Siemens'

Global Healthcare Sector, who is based in Germany.  However, when Liu submitted a travel

application to Zhao and Ohnesorge, Ohnesorge informed him that he could not attend because of "budgetary concerns." The timing of this rejection was highly suspicious, especially given that Liu had been invited to attend directly by Sotamaa. Moreover, Liu subsequently obtained definitive proof that this was merely a pretext to stop him from attending. Specifically, Liu discovered later in May that two other SLC China-based employees were sent in his place, including one who had not originally been on the invitation list until after Liu's own travel was blocked by Ohnesorge.

89.     After this retaliation and Ohnesorge's blocking of Liu's attempts to eradicate the price differentials by requiring a transparent tripartite contract structure, Liu complained directly to Sotamaa. By email dated May 10, 2010, Liu described the compliance issues he had sought to address within the Chinese healthcare operation, including the North Korean Rakwon 929 transaction, the failure to conduct due diligence on I/E companies and the large discounts at which equipment was being sold to I/E companies compared to Siemens' successful bid prices to the end-user hospitals. A copy of Liu's May 10 email is annexed hereto as Exhibit 3.

90.     Liu also specifically complained to Sotamaa about the retaliation to which he had been subjected because of his stance on compliance issues: "[T]remendous efforts [were] made to cover/deny the existence of problematic implication and to ask the whistle-blower to separate [from the] company." He explained his rationale for his internal whistleblowing as follows:

> I can only defend my compliance independence by giving up my career future in Siemens.... I only wish to address ... the compliance issues below. My duty was, and still is, to protect the organization from compliance risks. However ...if the client intentionally misbehaves, [the] compliance officer should follow the ethic[s] rules to take proper action.

(Exhibit 3, Page 1)

25

91.   Liu also expressly complained in his email to Sotamaa that the exclusion of the I/E companies from due diligence was part of a deliberate effort to evade due diligence and ignore obvious red flags:

> The exclusion of Import Company from Business Partner Tools was a conscious[ ] loop hole which impairs the effectiveness of [the] compliance scheme.  It was convenien[t] to by-pass relevant control and provided [an] invalid excuse for high risk business practice…. It was simply unethical to knowingly distort the application of guideline[s] and rules.  Even [though] stipulated by operation review team in the report (p.14).

(Exhibit 3, Page 2)

92.   Sotamaa replied by email dated May 17, 2010, in which she ignored Liu's complaints of retaliation and legal violations and instead instructed him to continue working with his manager, Zhao, and her team regarding the I/E issues.  Liu never heard back from Sotamaa again after that email.  A copy of Sotamaa's May 10 email is annexed hereto as Exhibit 3.

**G.   Siemens' Intentional Evasion of Due Diligence Requirements in Bidding for People's Liberation Army Hospital Contracts in China and Liu's Opposition to Such Evasion**

**(1)   Overview**

93.   In June 2010, Siemens submitted various bids in the annual central purchasing tender by the Chinese People's Liberation Army ("PLA") for the supply of various types of medical imaging equipment to PLA army hospitals in China.  Liu objected to a number of aspects of this process which raised major red flags for corruption, including the intentional failure of the business and compliance groups to perform adequate due diligence on offshore business partners through which the equipment was to be bid and sold and the subsequent ignoring of major red flags by senior compliance officers when limited due diligence was later

26

performed.

94.     Siemens' conduct in connection with the PLA tender intentionally violated the FCPA in several interrelated ways:

(a)     Siemens deliberately used two Hong Kong business partners as its intermediaries and resellers, both for submitting bids to the PLA and as Siemens' contract counter-party in the sale of the equipment to the PLA hospitals, despite the fact that Siemens AG, as a foreign entity, could have performed these functions itself and did, in fact perform these functions in the bidding and sale of its high-end "M1 equipment" in the same PLA tender. Moreover, these two offshore business partners were specified to Siemens by their affiliated Chinese intermediaries, one of which represented to Siemens that it could win the PLA bids because of its existing relationships with the PLA. Upon investigation, Liu discovered that the Hong Kong entities were "Zero-Presence" entities that did not maintain any physical presence or have any employees at the Hong Kong address listed. In sum, the use of these two Hong Kong entities raised multiple major red flags for corruption.

(b)     Siemens "jumped the gun" by authorizing the Hong Kong business partners to submit their bids to the PLA before due diligence had been completed on the business partners and before the business partners had been approved in Siemens' BPC tool.

(c)     When Siemens later internally approved the two Hong Kong business partners in its system, the approval was expressly based on false facts and was given despite the major red flags noted above which made it clear that the transaction posed an extremely high risk of corruption.

(d)     When Liu uncovered some of the real facts relating to these Hong Kong

27

intermediaries, he revoked the approval of the business partner in Siemens' BPC tool.  He was immediately rebuked by the Regional Compliance Officer to whom he reported and, less than a month later, had all of his review and approval responsibilities for both PLA and non-PLA transactions summarily removed.

        (2)     **Siemens' Bidding/Sales Structure for PLA Tender**

95.     Liu was told by Siemens' sales department that, prior to 2010, Siemens was largely unsuccessful in bidding in the annual tenders for supply of high-end medical imaging equipment for PLA hospitals.  In or around April 2010, an intermediary named Beijing Sheng Kang Da ("Sheng Kang Da"), which had never done business with Siemens in the past, approached Siemens to discuss how it could help Siemens win PLA hospital bids.  Sheng Kang Da's General Manager, Ms. Li Wei, offered to use her connections and contacts with high level PLA decision-makers to assist Siemens in winning the tender.  Ms. Wei was married to a nephew of a PLA hospital Vice President and had close ties with General Bai Shuzong, a former president of the PLA General Logistics Department.  All of these were major red flags for corruption.

96.     Siemens used three different sales and bidding models to bid on various categories of equipment in the 2010 PLA tender.  First, Siemens bid directly for the high-end "M1 equipment" tenders through its German parent company, Siemens AG.

97.     Second, for certain categories of its "M2 and M3" equipment Siemens submitted its bid through a third-party mainland Chinese company that was a PLA-authorized I/E company.

98.     Third, for certain other categories of M2 and M3 equipment Siemens used a structure whereby it worked with both a Mainland Chinese business partner and a Hong Kong

business partner that was "affiliated" with the mainland business partner, with the bid being submitted through the offshore Hong Kong entity and (if successful) sales contracts with the end-user hospitals also being entered into by the Hong Kong entity.  Within this third sales model, Siemens utilized two separate sets of business partners: (a) Sheng Kang Da, as the Mainland China business partner paired with Tai Wo International ("Tai Wo") as its Hong Kong affiliate; and (b) Guang Zhou Fortune as the Mainland China business partner paired with GK Medical as its Hong Kong affiliate.

### (3) Liu's Objections to the Use of Hong Kong Zero-Presence Intermediaries for Bidding and His Insistence That More Due Diligence be Performed on These Entities

99.     In early June 2010, Liu became involved in the Business Partner approval process for the Chinese and Hong Kong business partners utilized in the third sales model (i.e. the model in which bidding was through the Hong Kong business partners).  At that point senior business people at Siemens began putting considerable pressure on the compliance department to immediately approve the Hong Kong business partners prior to the June 11, 2010 due date for submission of the bids which were to be submitted through these Hong Kong business partners.

100.     In a series of emails between June 7, 2010 and June 11, 2010, Stephan Mueller, SLC's CFO for Healthcare, sought approval: (1) from the Siemens' central compliance department in Germany for the bidding structure to be used in the PLA bidding (i.e., using offshore Hong-Kong-based entities to submit the bids); and (2) from the Siemens' Chinese compliance group for approval of the two specific Hong Kong business partners involved in the proposed bidding.  Included on these emails were Liu and his manager, Zhao Ai Li, SLC's Regional Compliance Officer.

101.    In his June 7, 2010 email, Mueller initially claimed that GK Medical had already

been approved.  However, in an email the following day, he was forced to concede that neither

GK Medical nor Tai Wo had received approval following due diligence assessments.  Mueller

also claimed in his June 7 email that "both entities are affiliated to business partners in Mainland

China which have been qualified and authorized earlier." However, in the case of Tai Wo's

Mainland China partner, Sheng Kang Da, this was also not a true statement because it had not

been approved as a qualified business partner in China.

102.    On June 10, 2010, Christine Guenther, the administrative assistant to Siemens'

global Healthcare Sector Compliance Officer, Thomas Hauser, based in Germany, emailed

Mueller granting approval to the proposed PLA bidding structure.  However, the email expressly

stated that approval was conditioned on the following two requirements: (1) "[t]he CDD

[Compliance Due Diligence Report] for the particular BP [Business Partner] has to be carefully

checked and properly approved" and (2) "[t]he [Hong Kong] BP's mainland affiliate company

[must be a] national distributor for the subject products [and] evidence of this must be double

checked…."

103.    In an email dated June 11, 2010, to Ohnesorge, Zhao, Hauser and others, Liu

objected to the major red flags associated with the use of a business model utilizing a Hong

Kong intermediary:

> I, local healthcare compliance officer, did not consider the off-
> shored transaction practice complies with [either] Siemens position
> nor general principles of compliance.  The off-shored transaction
> raises the red flag from various perspectives and is not
> recommended usually.
>
> It is essential to justify the need to take off-shored approach,
> especially when [a] [Hong Kong] intermediary of [Siemens]

Healthcare China was specific[aly] mentioned in the [2008] SEC
charge [at] page 23 to 24.

\* \* \*

[There] exists no valid reason to use [Hong Kong Business Partner
in this case].  Not tax benefit, not for currency control, not
mandatorily requested by end user but for business convenience.
On the other hand, there exists other alternative solutions with less
compliance concern than off-shored model and one solution was
conducted [by Siemens] in 2008 successfully.

A copy of Liu's email is annexed hereto as Exhibit 9.

104.    Liu's reference to the solution used in 2008 related to a 2008 PLA tender in which

Siemens AG had previously bid directly to the PLA, thereby providing a simple solution to the

alleged need for a non-Chinese intermediary to be the seller.  More importantly, as described

above, Siemens AG was also directly bidding for all of the M1 equipment tenders in the same

2010 PLA tender in which Hong Kong intermediaries were being used, although Liu was not

aware of this at the time he wrote his email.

105.    Hauser replied to Liu's email a few hours later, telling him in an email also dated

June 11, 2010, that the Siemens' Sector headquarters and regional compliance officer had

already decided the rules for Siemens' PLA bidding and "there is no need to reopen the topic

again."  (See Exhibit 9)  In other words, Siemens' most senior global healthcare compliance

officer in Germany simply turned a blind eye to the red flags raised by Liu.

106.    Although the bidding structure was approved centrally in Germany, Liu had

approval authority in the Compliance Due Diligence Business Partner Tool over the specific

Hong Kong and Mainland China business partners being utilized in the bidding.  As set forth

above, "careful" review of the due diligence for these business partners and "proper approval" of

31

them were both express conditions imposed by Siemens' global compliance officers in his

approval of the PLA bidding structure as set forth in the June 10, 2010 email.

      107.    On June 11, the date the bids were due to be submitted, Liu refused to approve

Tai Wo and sent it back in the BPC Tool for further due diligence to be conducted.

      108.    Liu also refused to grant approval for Tai Wo's Chinese affiliate, Sheng Kang Da,

and also sent that entity back for further due diligence to be conducted.  Liu documented his

reasons for rejecting these entities in the CDD report for Sheng Kang Da as follows:

> The upcoming information verified by [the] local compliance officer disclosed the risk factors calling for reassessment of the CDD [Compliance Due Diligence Report]:
>
> 1.  The General manager/major shareholder had strong [ties] with [a] Governmental official related [to] the business decision.
>
>     \*The subject was the former spouse of a family member of high-ranking military hospital president (NO.1 ATTACHED HOSPITAL OF NO.3 MILITARY MEDICINE UNIVERSITY and the general hospital of Chinese People's Liberation Army) ....
>
>     \* [She also has a] Reputation of strong influence with People's Liberation Army General Logistics Department of Health
>
> 2.  The Business partner, instead of [Siemens AG]/SLC directly bidding for high-end product, participated [in the] bidding of People's Liberation Army General Logistics Department of Health. It took spot-dealer's role to resell Siemens product to the hospitals in China via appointed [Hong Kong] shell company with minority share (9%). Without solid justification applying special approval to engage off-shored transaction which was stopped after 2007.
>
> 3.  Authorization document issued by [Siemens] was granted to the subject before the required CDD on appointed [Hong Kong] entity was approved.
>
> 4.  The CDD of other appointed [Hong Kong] entity engag[ed in] the same bidding was disapproved because of questionable document reflecting the creative process implication.

5. The function of this [Business Partner] is closer to [that of a Government Related Intermediary] in high risk level rather than to distributor/[Business Partner] in middle risk level. Accordingly, I withdrew the approval and request the comprehensive information to be reflected in the application faithfully.

109.    Another red flag uncovered during Siemens' due diligence for Tai Wo was that Tai Wo was listed as having "agency" relationships with GE and Phillips, two of Siemens' major competitors in high-end imaging equipment. This was a significant violation of Siemens' usual business practice of working only with agents and distributors who do not sell competing high-end equipment.

110.    Siemens went ahead and submitted the PLA bids on June 11, 2010 despite the foregoing major red flags raised by Liu and the fact that neither of the Hong Kong entities submitting the bids had been approved by Liu in the Business Partner Review system. This violated the terms of Siemens' global compliance approval for the PLA bidding structure, given the previous day, which required that due diligence approval be obtained for each of these Hong Kong intermediaries.

111.    After rejecting Tai Wo as a suitable business partner and requiring additional due diligence be performed, Liu emailed global Compliance Officer Hauser in Germany on June 12, 2010 and specifically warned him that appropriate due diligence had not been conducted on either of the Hong Kong business partners (Tai Wo and GK Medical). In that email Liu stated:

1. The financial strength of this [Hong Kong Business Partner] was not verified. The model approved requires [Hong Kong Business Partner] to buy the product from [Siemens AG] then resell to the end-user. The under capitalization without credited financial statement indicates the high possibility of shell company practice. To confirm the business capacity of the candidate [Hong Kong Business Partner], on-site check was recommended to clarify

33

the concern. For every [Business Partner] in China, we did conduct on-site check.

2. The only relationship between China [Business Partner] and [Hong Kong Business Partner] was one common shareholder who holds 40% of China entity and 9% of HK entity. If the record was correct, the common shareholder acquired [Hong Kong Business Partner] 9% share in April 2010, the China [Business Partner] was approved on 12 May 2010. In other words, by the record, before April 2010, [there was] no connection between [Hong Kong Business Partner] and China [Business Partner] and Siemens Healthcare has 1 month business history with China [Business Partner]. (Emphasis added)

A copy of this email is annexed hereto as Exhibit 9.

112.    The second Hong Kong entity involved in the bidding, GK Medical, had also not been approved by Liu or anyone else prior to the bids being submitted on June 11, 2010. Again, this directly violated one of global Compliance Officer Hauser's express conditions for approval of the PLA bidding.

113.    On June 23, 2010, based on information he uncovered regarding GK Medical, Liu expressly disapproved GK Medical as a business partner in the BP Tool. His entries in the CDD report document that (1) GK Medical was not a corporation, had no share registration record in Hong Kong and in fact was registered as an individual not a company; (2) the D&B report obtained in the due diligence process related to a separate entity named GK Asia; and (3) false documentation had been provided by GK Medical in the form of a purported board resolution, notwithstanding that it was simply an individual doing business in an assumed name and not a corporate entity.

114.    Six days later, on June 29, 2010, Zhao Ai Li abruptly removed Liu as the approver in the BPC Tool for Tai Wo.

**(4)    Siemens' Rationale for Using the Hong Kong Entities Was Transparently False**

115.    In a transparent attempt to "paper over" the glaring red flags and due diligence violations associated with use of the Hong Kong entities in the PLA bidding, on July 20, 2010, global Healthcare Sector compliance officer Hauser and SLC Regional Compliance Officer Zhao Ai Li, circulated a memorandum ("July 20 Memorandum") in which they purported to "summarize the key decisions made in connection with the PLA Tender at the bidding stage." A copy of the July 20 Memorandum is annexed hereto as Exhibit 10.

116.    The July 20 Memorandum also belatedly – and for the first time – approved the use of the Hong Kong intermediary Tai Wo and Sheng Kang Da.

117.    The rationale repeatedly articulated by Siemens' healthcare business for using the Hong Kong entities, Tai Wo and GK Medical, was that, in order for the PLA to receive an exemption from VAT, the sale had to be made by a non-Mainland Chinese seller. This rationale is also repeated in the July 20 Memorandum.

118.    However, as discussed above, Siemens AG itself is not a Mainland Chinese company, and could therefore have fulfilled the same role as Tai Wo or GK Medical without any risk of corruption. It is readily apparent, therefore, that the business reasons advanced by Siemens are merely a pretext to cover-up the corrupt reason for utilizing Tai Wo and GK Medical into these transactions.

119.    The July 20 Memorandum acknowledges that:

> The use of a Hong Kong vehicle caused immediate attention. The proposed PLA Bidding Set-up was carefully assessed and approved on the following conditions:
>
> 1. The Compliance Due Diligence ("CDD") for the particular

> Business Partners, the mainland [Business Partner] and its [Hong
> Kong] associated company, ha[d] to be carefully conducted and
> properly approved.

120.    However, the memorandum conspicuously failed to address the fact that no

adequate due diligence was performed – and no approval was given for these entities -  prior to

bidding on June 11, 2010.

121.    Most notably, the July 20 Memorandum entirely ignored the numerous major red

flags raised and documented by Liu – and indeed does not even acknowledge that he raised them

or that he previously rejected approval of the Hong Kong intermediaries.

122.    Instead, the July 20 Memo claimed that the Regional Compliance Officer for

China personally conducted her own on-site due diligence on Sheng Kang Da and that a CDD

"was conducted" on Tai Wo by some other unspecified person.

123.    Hence, in the July 20 Memorandum, Hauser and Zhao (Siemens' global

healthcare and regional compliance officers) belatedly granted retroactive approval to the two

Hong Kong intermediaries involved in the bidding without addressing – or even acknowledging -

- any of the red flags raised by Liu.

124.    This approval was formally entered into the BPC Tool CDD report for Tai Wo by

Zhao on July 29, 2010.  Notably, Zhao's entry in the CDD report explaining her approval falsely

implied that Liu agreed with the approval by stating:  "[Tai Wo] was carefully reviewed by

[District Compliance Officer] (Liu Meng Lin), [Regional Compliance Officer for] China (Zhao

Ai Li) with help from [Regional Compliance Officer for] Hong Kong (Phyllis Tse)."

### (5)    Liu Again Revokes Approval for Tai Wo After Conducting His Own On-Site Due Diligence on Tai Wo in Hong Kong

125.    In early August 2010, two months after the PLA bids were submitted – and less

than two weeks after the self-serving July 20 Memorandum was issued – Liu was on a business

trip to Hong Kong on another business matter. During his trip, he decided to conduct his own

on-site check of the office listed by Tai Wo and discovered that Tai Wo's claimed offices were

those of a "secretarial service" it used as a mail drop, and that it had no employees or offices of

its own at that location.

126.    Although Liu's status as "approver" in the BPC Tool had been revoked, his

superiors had failed to remove him as a "reviewer" and this allowed him to request that Dr.

Helge Seefeld, the overall administrator or "owner" of the BPC system, withdraw the approval

retroactively granted to Tai Wo by the July 20 Memorandum.

127.    On August 9, 2010, upon his return from Hong Kong, Liu therefore requested that

Dr. Seefeld withdraw the approval that had been given to Tai Wo in the BPC Tool. His entry in

the BPC Tool explaining his rationale was quoted verbatim in an email, dated August 9, 2010,

sent by the BP review tool to Zhao, Mueller and others.

128.    Hence, after repeatedly objecting to red flags associated with Tai Wo and GK

Medical, Liu finally uncovered and documented conclusive evidence that Tai Wo was a sham

entity that could play no legitimate role in the PLA transaction.

129.    However, rather than immediately taking action to launch an investigation into

this apparent corruption, or withdrawing the PLA bids submitted through this Hong Kong entity,

Siemens' senior compliance officials instead berated – and subsequently retaliated against – Liu

himself.

130.    In an email to Liu and Hauser dated August 11, 2010, two days after Liu reversed

approval of the Hong Kong entities, Regional Compliance Officer Zhao (Liu's manager) berated

37

him for overruling her prior approval:

> It is totally unacceptable that you withdrew approval given in the
> system after a decision has been made and clearly communicated
> to you via a memorandum jointly signed by Mr. Hauser and me.
> Such behavior will only cause confusion and disruption.  Such
> unprofessionalism will not be tolerated.

A copy of Zhao's email is annexed hereto as Exhibit 11.

### (6)   Siemens Wins Certain PLA Bids Submitted Through Tai Wo and Certain Bids Submitted Directly by Siemens AG

131.    Siemens was ultimately successful in a number of bids it submitted in the 2010

PLA Tender, including two of the Tai Wo bids totaling approximately $1 million.

132.    Siemens AG was also successful in two PLA bids it submitted directly, thereby

conclusively proving that there was no legitimate need to use off-shore Hong Kong

intermediaries for any of the bids.

### H.   Siemens' Retaliation Against Liu By Promptly Stripping Him of Any Further Role in Approval of any Business Partners or Transactions Thereby Removing Most of His Job Responsibilities

133.    Two weeks later, Siemens abruptly removed Liu's responsibility for all business

partner and transaction due diligence and approvals.

134.    By email dated August 31, 2009, Ohnesorge and Zhao notified all employees that

Sandy Yuen was replacing Liu effective September 1, 2010, as the person "responsible for

approving Healthcare … transactions [and] compliance issues in relation to operation

consultation and case tracking."  A copy of the email is annexed hereto as Exhibit 12.  Having

been stripped of most of his duties, the Ohnesorge and Zhao email stated that Liu's duties would

instead be limited to "training, process improvements and other special tasks assigned by [the]

[Regional Compliance Officer]."

135.    In other words, because of Liu's persistent attempts to prevent the Siemens' due diligence and anti-corruption systems from being deliberately circumvented, the most senior executive in his division removed him from any further involvement in the process.

136.    The circumstances surrounding the approval process for submitting PLA bids through two zero-presence Hong Kong entities without any legitimate business justification – together with first ignoring, and then directly retaliating against, Liu for repeatedly raising these inconvenient red flags – conclusively demonstrates that both Siemens' regional and its global healthcare compliance officers were complicit in allowing this blatantly corrupt transaction to proceed.

**I.      Liu's Comprehensive Review of All Direct Bid Transactions During the Period July-Sept 2010 and His Compilation of Evidence of Widespread Corruption in These Transactions**

137.    Following the removal of his primary duties, Liu performed an in-depth review of the available documentation for all of Siemens "direct-bid" sales of high-end healthcare equipment in China during a three-month sample period to determine the magnitude of price deviations between Siemens' accepted bid price and the actual sales price between Siemens and the hospital's I/E company.  The documentation for certain transactions from that period were not yet available, but Liu was able to review both the bidding information and contracts for a substantial number of these sale transactions.

138.    As a result of this review Liu compiled a spreadsheet documenting the amount by which Siemens' successful bid price had been inflated over the actual sale price at which Siemens contracted with the I/E company designated by the hospital in approximately 30 successful bids during the period July-September 2010 (the "2010 Inflated Bid Spreadsheet").  A

39

copy of the 2010 Inflated Bid Spreadsheet is annexed hereto as Exhibit 13.

139.    The "mark-up" on the inflated bids documented in the 2010 Inflated Bid
Spreadsheet was almost always a minimum of 25%, and frequently amounted to 40% to 70%. In
some cases Siemens' successful bid price was marked up by 100% (or more) over the actual sale
price, i.e. the bid price was more than twice the actual contract price. For the 32 transactions
documented in the spreadsheet, the average percentage by which the bid price had been inflated
when compared to the sales price was 47%.

140.    Indeed, in one case documented in the 2010 Inflated Bid Spreadsheet the inflated
bid price was 133% higher than the actual sales price. In that case, Siemens bid $2,030,000 to
the end-user public hospital but subsequently sold the equipment to the intermediary I/E firm for
$870,000. Upon information and belief, the $1,160,000 differential between these two prices
was used to pay "kick-backs" to the hospital procurement officials involved in selecting the
Siemens bid and other officials and intermediaries involved in the corrupt scheme.

141.    Liu reasonably believed that the evidence he uncovered proved that Siemens
routinely and knowingly entered into corrupt transactions in which bribes were paid in return for
six-figure and seven-figure medical imaging equipment sales to public hospitals in China.
Because Siemens routinely sold equipment at prices that represented steep discounts from the
successful bid price, it was obvious that Siemens was knowingly submitting "inflated" bids.
Moreover, the only possible explanation for the substantial reduction in price at which Siemens
sold to the hospital-appointed intermediary – and for why the procurement officials at the public
hospitals would accept the inflated bid prices in the first place – is that this was being used as a
mechanism to pay bribes to these procurement officials.

142.     Under this scheme, it was apparent to Liu that the hospitals entered into two-party contracts with the I/E companies, which in turn entered into their own separate two-party contracts with Siemens.  In this way, the hospital procurement officials could contract with the I/E companies and/or other intermediaries to pay the higher accepted bid price and all documentation in the hospital's records would be consistent with that higher price.  However, Siemens received a substantially lower purchase price, with the "differential" being used to pay kick-backs to the hospital procurement and other officials involved in the scheme.  There simply was no other plausible explanation for price reductions of the magnitude documented by Liu.

**J.     Example of Specific Transactions for which Liu Compiled Documentation of the Inflated Bids**

143.     The following is an example of one of the corrupt transactions included by Liu in the 2010 Inflated Bid Spreadsheet for which he compiled documentary proof.

144.     In the summer of 2010 Siemens submitted direct bids to Weihai Municipal Hospital's tendering agent for the sale of two high-end CT Scanners to Weihai Municipal Hospital in Shandong Province: (a) a SOMATOM Definition Flash ("Definition Scanner"); and (b) a SOMATOM Sensation Open ("Sensation Scanner").    Siemens bid $2,850,000 to supply the Definition Scanner and $650,000 to supply Sensation CT Open.  Siemens bids for both machines were accepted and the amount of Siemens' bid prices were retrieved by Liu from a print-out of the bidding documentation available to bidders on www.chinabidding.com.

145.     With respect to the Definition Scanner, Siemens subsequently entered into a contract dated June 22, 2010 with Qingdao MEHEL International Trading Co., Ltd ("MEHEL"), an I/E company specified by the hospital, pursuant to which Siemens sold the equipment for

41

$1,802,500, i.e., $1,047,500 <u>less than</u> the successful bid price.  Hence, for this transaction Siemens' bid price was inflated by 58 percent over the actual sale price.

146.    With respect to the Sensation Scanner, Siemens entered into a second contract, dated August 27, 2010, with MEHEL pursuant to which it sold the equipment for $517,200, i.e., $132,800 less than the successful bid price.  Hence, for this transaction Siemens' bid price was inflated by 26 percent over the actual sale price.

147.    According to the two MEHEL sales contracts and the bid documents which Liu reviewed from Siemens' archives, the scope of the equipment and services supplied by Siemens was exactly the same in the bid submitted by Siemens directly to Weihai Hospital as it was in each of the sales contracts entered into between Siemens and the I/E company, MEHEL, at the substantially lower prices.

148.    In a Confirmation Letter dated June 22, 2010, addressed to Siemens AG, Weihai Hospital confirmed that it was the buyer of the Definition Scanner and designated MEHEL as its "authorized import agent" with responsibility "to obtain the import license concerning the Product."

149.    Similarly, with respect to the Sensation Scanner, Weihai Hospital issued a Power of Attorney dated August 30, 2010 confirming that the hospital had authorized MEHEL to be its "general agent" to enter into a supply contract with Siemens on behalf of the hospital to purchase the equipment and "go through all necessary import procedures" with respect to the transaction.

150.    Both the Confirmation Letter and the Power of Attorney confirm that MEHEL's only function in this transaction was to perform the necessary import procedures.  However, customs brokers in China routinely perform this function for approximately two percent of the

total transaction price.  In addition, Siemens itself had an affiliate, Siemens International Trade Ltd ("SITL"), which was established as a trading company in China and could have performed the necessary import procedures.

151.    Moreover, MEHEL was designated by the end-user hospital only after the bid had been accepted and therefore played no role on Siemens' behalf in "selling" the equipment that could entitle it to any legitimate sales commission or mark-up.  In addition, Siemens' personnel, not the I/E company would install and commission the equipment. Therefore, commissioning and installation cannot account for the price differential either.

152.    In short, the I/E company simply does not participate in any phase of selling, specifying, commissioning, or installing the equipment, nor does it supply warranty or repair services.  Therefore, the I/E company's exorbitant margins cannot be justified by any legitimate explanation.

**K.**    **Siemens' Retaliatory Suspension of Liu and Retaliatory Decision to Terminate His Employment**

153.    By email dated October 13, 2010, Liu requested a meeting with Stefan Mueller, SLC's CFO for Healthcare, to discuss the substantial price deviations he had documented.

154.    On October 26, 2010, Liu met with Mueller and Mr. Jin, a Siemens LoA officer, at Mueller's office in Shanghai.  Liu provided Mueller with a full version of the 2010 Inflated Bid Spreadsheet, together with additional backup spreadsheets showing the substantial price deviations on the transactions for which he had been able to obtain documentation as of that date.

155.    After reviewing the spreadsheets compiled by Liu, Mueller asked Jin to further investigate the reason for the price deviation and agreed that the three should meet again in early November to discuss the results.

156.    On November 12, 2010, Liu attended a Siemens internal town hall meeting (the "Town Hall Meeting") held in Shanghai by Mr. Mei-Wei Cheng, SLC's President and CEO. During the meeting Liu publicly made an allegation that "compliance was low and that if [Siemens] were to follow compliance guidelines, Siemens would lose 30% of our healthcare business." Liu also stated that he had evidence to support his statement.

157.    Later in the day on November 12, Liu was handed a letter purporting to be dated November 2, 2010 which summarily terminated him from his compliance position and instructed him not to report to work during the remaining three months of the initial term of his employment contract. The letter – which was dated less than a week after Liu presented his evidence of the widespread price deviations to Mueller and was handed to him a matter of hours after he spoke out at the Town Hall Meeting – also provided Liu with "early notice that [his] Employment Contract will not be renewed upon its expiration on March 2, 2011." A copy of the letter is annexed hereto as Exhibit 14.

158.    The removal of Liu from his position and decision not to renew his employment contract were the culmination of a series of escalating acts of retaliation designed to stop Liu from opposing the corrupt practices set forth in this Complaint.

159.    As a result of his removal from his position, Liu was removed from any further involvement in reviewing Siemens' healthcare transactions and never had the follow-up meeting with Mueller.

160.    On November 15, 2010, Liu received a letter by personal delivery from SLC's President and CEO, Cheng. In that letter Cheng confirmed the statement that had been made by Liu at the Town Hall Meeting and asked Liu to provide a written statement and all supporting

44

evidence to Bu Yun in SLC's HR department before November 17, 2010.

161.    Later that same day Liu replied to Cheng with an email containing an overview of the compliance problems and recommending that an independent audit be conducted by a non-compliance related department, such as Siemens' Operation Review Team and that timely remediation be implemented including "voluntary disclosure" to the relevant authorities.  Copies of Mr. Cheng's letter and Liu's email are annexed hereto as Exhibit 15.

162.    Liu's email included the following:

> The progress of decaying could be identified from many perspectives. Briefly, at [an] organizational level, compliance independence was surrendered first, followed by compliance gravity shift[ing] from ethics to revenue, and inevitably, compliance metamorphosed into complicity.  At [an] awareness level, from innocent native, voluntary ignorance to knowingly misbehav[ing].  At [a] practice level, starting from misinterpreting the definition of written guideline[s], overlooking the procedure delinquency to actively inventing perceived [archiving]  record. As for [the] inconvenient [compliance] officer [he was], segregated, demonized and terminated.
>
> As for evidence, [the] following Healthcare compliance topics should be address[ed] or referred:
>
> 2.    Business model for SLC Healthcare commission business
>
> ***
>
> b.    Illegitimate price deviation between published record and actual transaction
>
> ***
>
> d.    Irregular practice such as off-shored transaction [have a] lack of solid justification
>
> e.    Questionable OEM/local purchase were created at compliance risks of [Business Conduct Guidelines] violation
>
> 3.    Third-party management

45

a. Ineffective intermediary management, unqualified distributors and de-facto [Business Consultants] were approved over the objection of [the] responsible compliance officer

b.    False statement was made to [Siemens AG] to … manufacture authorization or undu[e] approval.

c.    Willfully escaping from [Business Partner Due Diligence] process to cover unjustifiable intermediary margin.

d.    Number of one-time dealers were employed to carry out direct sale product without applicable process control/authorization

e. No post-approval audit was conducted to satisfy the management obligation requested by authorities.

Recommendation:

Address on the evidence cases and conduct [and implement] independent audit by non-compliance-related department, such as Operation Review team, and take necessary remediation actions according to the review result, IN A TIMELY MANNER. The remediation action [that] should be taken [is] no less than voluntary disclosure [to authorities] and the accountability for managerial misbehavior to withhold settlement agreement.

163.    On November 15, 2010, Liu also forwarded to Siemens' Corporate Compliance Monitor, appointed pursuant to the 2008 Plea Agreement, a copy of his foregoing email to Cheng.

164.    On November 19, 2010 Liu followed up by emailing Mr. Cheng "sample" evidence of his claims, including a copy of the Tai Wo BPC Tool CDD Report.  A copy of Liu's cover email is annexed hereto as Exhibit 16.

165.    On November 23, 2010, Liu was contacted by Matthias Oberlinner, SLC's Director of Compliance Investigations, who arranged to meet with him in person on November 28.

166.    When Oberlinner subsequently met with Liu on November 28, 2010, Liu gave him a copy of the 2010 Inflated Bid Spreadsheet.  However, after that meeting Liu never heard

46

further from Cheng, Oberlinner or anyone else again concerning his complaints.

167.    Liu's employment ended when his contract ended on March 2011 and was intentionally not renewed by Siemens.

**L.    Liu's Filing of a Dodd-Frank SEC Whistleblower Disclosure**

168.    On May 17, 2011, Liu filed a whistleblower disclosure with the United States Securities and Exchange Commission pursuant to 15 U.S.C. § 78u-6, detailing the FCPA internal control and bribery violations by Siemens that he had uncovered and attempted to remedy.

169.    On June 30, 2011, Liu provided Siemens with a copy of his SEC whistleblower submission and reiterated his claim that he had been retaliated against in violation of the Sarbanes-Oxley and Dodd-Frank laws.

## FIRST CAUSE OF ACTION

170.    Pursuant to Fed. R. Civ. P. 10(c), plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "169" as if repeated and incorporated herein.

171.    Senior Siemens executives, compliance officers and legal officers knowingly allowed Siemens due diligence and anti-corruption internal controls to be evaded and con-sciously disregarded and deliberately ignored numerous "red flags" that should reasonably have alerted them to an extremely high probability that: (a) bribes were being paid to Chinese officials in connection with Siemens' sale of multi-million dollar medical imaging equipment to public hospitals in China and North Korea; and (b) Siemens' employees were complicit in such a bribery scheme by knowingly submitting inflated bids to Chinese public hospitals  at prices that far exceeded the amount that Siemens expected to be paid.

172.    Siemens, conduct set forth in this Complaint violated the Securities Exchange Act

47

of 1934, as amended by the FCPA, including but not limited to 15 U.S.C.A. §§ 78m and 78dd-1 *et seq.*

173.   Siemens demoted, harassed, suspended and then discharged Liu because of his objections and complaints about violations of the FCPA and his attempts to curtail such violations.

174.   The financial information of SLC is included in the consolidated financial statements of Siemens AG.

175.   Siemens demoted, harassed, suspended and then discharged Liu because he made disclosures that were required and/or protected under laws, rules and regulations that are subject to the jurisdiction of the Securities and Exchange Commission, including but not limited to the Sarbanes-Oxley Act of 2002, the Securities Exchange Act of 1934 and the FCPA.

176.   By reason of the foregoing, Siemens has violated 15 U.S.C. § 78u-6(h)(1)(B) thereby causing Liu damages.

**WHEREFORE**, plaintiff hereby demands judgment against defendant as follows:

(i)   On his first cause of action, (a) awarding Liu two-times the amount of his back-pay damages; (b) awarding Liu front pay damages in an amount to be determined at trial; and (c) reimbursing Liu for his litigation costs, expert witness fees and attorneys' fees;

(ii)     For such further relief as the Court deems just and proper.

Dated:   New York, New York
         January 14, 2013

                           KAISER SAURBORN & MAIR, P.C.
                           Attorneys for plaintiff


         By:     _____
                       David N. Mair [DM-8883]
                 111 Broadway
                 New York, New York 10006
                 (212) 338-9100

49